[S. F. No. 17382. In Bank. May 29, 1947.]

CALIFORNIA MOTOR TRANSPORT CO., LTD. et al., Petitioners, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents; VALLEY MOTOR LINES, INC. et al., Interveners.

Douglas Brookman and Norman A. Eisner for Petitioners.

Everett C. McKeage, Roderick B. Cassidy, John M. Gregory, Hal F. Wiggins and Boris H. Lakusta for Respondents.

Marvin Handler for Interveners.

CARTER, J.—This is a review of an order of the Railroad Commission (now the Public Utilities Commission) commanding petitioner California Motor Transport Company, a highway common carrier (hereinafter designated Motor Transport), to refrain as underlying carrier or otherwise from transporting property via Pacheco Pass between San Francisco and Fresno and other San Joaquin Valley points unless it obtains a certificate of public convenience and necessity from the commission; and commanding petitioner, California Motor Express, an express corporation (hereafter designated Motor Express), to refrain from using Motor Transport as an underlying intermediate for the transportation of express between the same points unless the latter obtains the above mentioned certificate.

There are two main highway routes between San Francisco and Los Angeles commonly designated the coast route and the valley route, respectively. Paso Robles is a city on the coast route, Fresno is a city on the valley route, and Pacheco Pass is a lateral connecting the two routes at a point between San Francisco and Los Angeles. There is also a connecting lateral from Paso Robles to the valley route.

Motor Transport acquired (1) a certificate of public necessity and convenience from the commission in 1930 to transport express traffic for Motor Express between San Francisco and Los Angeles, via the coast route, subject to the restric-

tion that no service could be given to intermediate points; (2) a certificate (in 1934) for similar traffic between San Francisco and Los Angeles via Pacheco Pass and Fresno, with the same restriction as number (1); (3) a certificate (in 1944) to operate between San Francisco and Paso Robles on the coast route; (4) a certificate (in 1944) to operate between Paso Robles and Fresno.

Petitioners maintain that by reason of the 1941 amendment (Stats. 1941, p. 2061, § 1) of section 50¾ (*infra*) of the Public Utilities Act (Stats. 1915, p. 115; 2 Deering's Gen. Laws, Act 6386) Motor Transport has acquired the right to transport express for Motor Express and the latter to use the former for such transportation from San Francisco to Fresno *via Pacheco Pass,* a saving in distance of 127 miles over such transportation via Paso Robles.

Section 50¾ was added to the Public Utilities Act in 1935 (Stats. 1935, p. 1831) along with other amendments making specific and comprehensive provisions for the regulation of *highway* common carriers by the commission. This section (50¾) required such carriers to obtain a certificate of public convenience and necessity (except in certain cases) before commencing operations. It provided that franchises could be transferred only with the consent of the commission, and that in issuing a certificate the commission ''may attach to the exercise of the rights granted by said certificate such terms and conditions as, in its judgment, the public convenience and necessity require.'' The section as amended in 1941 further provides: ''Without the express approval of the commission, no certificate of public convenience and necessity issued to ~~any~~ one highway common carrier under the provisions of this section, or heretofore issued by the commission *to one highway common carrier* for the transportation of property by auto truck or self-propelled vehicle, nor any operative right of *one highway common carrier* founded upon operations actually conducted in good faith on July 26, 1917, shall be combined, united or consolidated with another such certificate or operative right *issued to or possessed by another highway common carrier* so as to permit through service between any point or points served, *by one highway common carrier,* ~~under any such separate certificate or operative right,~~ on the one hand, and any point or points served, *by another highway common carrier,* ~~under another such certificate or operative right,~~ on the other hand; nor, without the express approval of the commission, shall any through route or joint,

through, combination, or proportional rate be established by ~~any~~ *one* highway common carrier between any point or points which it serves ~~under such certificate or operative right~~ *on the one hand* and any point or points served ~~which it serves under any other such certificate or operative right~~ by another highway common carrier, on the other hand. *Any one highway common carrier may establish through routes and joint rates, charges, and classifications between any and all points served by such highway common carrier under any and all certificates or operative rights issued to or possessed by such highway common carrier."* [Portions italicized are new and those stricken out were deleted by the 1941 amendment.] The last quoted sentence (added in 1941) is relied upon as a grant by the Legislature permitting the establishment of the route here involved.

In interpreting the last sentence above quoted several pertinent factors are of controlling significance. The Constitution confers upon the Legislature authority to delegate to the commission broad powers in the regulation of carriers and public utilities. (Cal. Const., art. XII, §§ 17, 20, 21, 22, 23, 24.) The Public Utilities Act, *supra,* unequivocally provides for the filing of rate schedules with the commission (§ 14) ; for the giving of permission by the commission for changing rates (§ 15) ; that no common carrier shall operate until its rates have been filed (§ 17) ; for supplying the commission with information necessary for the commission to enforce the act (§ 28) ; for the fixing of rates by the commission (§ 32) ; *that no highway common carrier shall operate as such until it has obtained a certificate of public convenience and necessity from the commission* (§ 50¾) ; requiring consent of the commission to transfer an operative right and authorizing it to affix conditions and restrictions to its consent (§ 50¾) ; the vesting of the commission with power to "supervise and regulate every public utility in the state and to do all things, whether herein specifically designated or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." (§ 31.) Police power over public utilities has been conferred upon the commission. (*Sutter Butte Canal Co.* v. *Railroad Com.,* 202 Cal. 179 [259 P. 937].) The power granted to the commission in issuing certificates of public convenience and necessity is very broad. (*San Diego etc. Ferry Co.* v. *Railroad Com.,* 210 Cal. 504 [292 P. 640].) The extensive functions which have been delegated to the

commission with reference to highway common carriers is summarized as follows in *Sale* v. *Railroad Commission*, 15 Cal.2d 612, 617 [104 P.2d 38] : ''Created by the Constitution in 1911, the commission was designed to protect the people of the state from the consequences of destructive competition and monopoly in the public service industries. (Citations.) Although it has been termed a '*quasi*-judicial' tribunal in some of its functions, its powers and duties go beyond those exercised by the judicial arm of government. (Citation.) A court is a passive forum for adjusting disputes, and has no power either to investigate facts or to initiate proceedings. Litigants themselves largely determine the scope of the inquiry and the data upon which the judicial judgment is based.

''The powers and functions of the Railroad Commission are vastly different in character. It is an active instrument of government charged with the duty of supervising and regulating public utility services and rates. (Cal. Const., art. XII, secs. 22, 23.) The Constitution gives the legislature full authority to implement the commission's powers with legislation germane to public utility regulation, and under this authority the legislature has departed from traditional techniques of judicial procedure. The commission has the right and duty to make its own investigations of fact, to initiate its own proceedings and in a large measure to control the scope and method of its inquiries. (See, Public Utilities Act, *supra*, *passim*; 15 Cal.L.Rev. 445.) All hearings, investigations and proceedings are governed by the provisions of the act and by rules of practice and procedure adopted by the commission. 'No informality . . . shall invalidate any order, decision, rule or regulation made. . . .' (Public Utilities Act, *supra*, sec. 53.) Hence, unless the act requires the commission to proceed in a certain way, the only limitation upon its procedural powers is its duty to provide a fair hearing to any party whose constitutional rights may be affected by a proposed order.

''In the exercise of its authority over highway common carriers, with which we are here particularly concerned, the commission is governed chiefly by section 50¾ of the Public Utilities Act. Under that provision it is required to supervise and regulate such carriers in all matters affecting their relationship with the shipping public. It may grant or deny operative rights with or without a hearing and upon such terms as, 'in its judgment, public convenience and necessity require.' After a hearing, it may amend, suspend or revoke

an existing certificate of public convenience and necessity for good cause shown. No operative right may be transferred except upon the authorization of the commission. When, after a hearing initiated by complaint or by the commission upon its own motion, it is found that a carrier is operating without a certificate or is otherwise violating the act, it may order the offending party to cease and desist. It will be noted that in the exercise of all of these powers public convenience and necessity is the criterion of administrative judgment.'' The commission is staffed and equipped and by long experience especially qualified to ascertain the facts and make determinations involving the public convenience and necessity—the routes to be used, and the points to be served and the service to be given by various competing carriers.

In the instant case the precise matter at issue is the advisability of permitting a carrier to follow a certain route and to serve certain points and the effect upon such operative rights of the acquisition by one carrier of several operative rights from other carriers. The impact upon the overall picture of regulation of the many carriers and the public good flowing from the various possible combinations of the several operative rights possessed by one carrier is manifest. Such combinations might well disturb the smooth flow of traffic where they result in routes and points of service which conflict with operative rights of other carriers already serving the same area. These are problems peculiarly within the function of the commission and it is best able to secure and maintain a consistent and orderly regulated pattern. For all of these reasons the 1941 amendment must be scrutinized with care. It must not be construed to take from the commission this important power of regulation with all the attendant experience and equipment necessary to its determination unless the legislative intent is clear and beyond doubt. It is not lightly to be assumed that the commission having available to it all the powers it has been granted, the Legislature by the bare enactment of a legislative act intended to make, in effect, an outright grant of an operative right free from the scrutiny and examination of the commission, which may well throw into confusion the whole regulating plans of the commission. It might be argued that for these reasons a carrier could not combine his rights under the 1941 amendment without the consent of the commission, but it is not necessary to go that far in this case. Assuming that the amendment does authorize (without the commission's

approval) a carrier to give through service from point A to point C where he has acquired two certificates, one to serve over a fixed route from point A to point B and the other from point B to point C, it certainly goes no further. It does not authorize the carrier to follow a different route between two points because it has various certificates covering such points. Here petitioners seek to follow the Pacheco Pass route to serve Fresno from San Francisco rather than by way of Paso Robles. The amendment together with the subject matter immediately preceding it are concerned principally with authorizing *through* service and the incidents thereof rather than a shortening or change of routes.

There is another reason why the 1941 amendment cannot be said to confer the rights claimed by Motor Transport. It will be recalled that the certificate to operate between San Francisco and Los Angeles over the coast route and via the coast route through Pacheco Pass and Fresno and then via the valley route were given subject to the restriction that no service be given to intermediate points between San Francisco and Los Angeles nor between the terminals and intermediate points. For the reasons heretofore discussed we cannot believe that the Legislature intended to wipe out those restrictions by the 1941 amendment. It did not clearly purport to do so, and to have done so by legislative fiat would be disruptive of the orderly procedure and plan of regulation by the commission. It requires more than the expression found in the 1941 amendment to show an intent to abrogate prior orders of the commission.

The report on the amendment by the Legislative Counsel to the Governor when it was before the latter for his consideration is relied upon. It merely gives a digest of the amendment and adds nothing to the wording of the legislation itself. Thus, it is of small value as an aid to construction.

Petitioners contend that the order of the commission authorizing the transfer to Motor Transport from the Valley and Coast Transit Company of a certificate without imposing restrictions *ipso facto* conferred upon Motor Transport the right to serve Fresno via Pacheco Pass, or in other words, that the restriction in its certificate (the second above mentioned certificate), to give through service between Los Angeles and San Francisco via the coast route, Pacheco Pass and the valley route, that it could not serve intermediate points was removed by the order permitting the transfer without mentioning that limitation. The third and fourth

certificates above mentioned were originally granted to Valley Coast and Transit Company in 1931 and 1928, respectively, and were acquired by Motor Transit in 1944. The transfer was approved by the commission (45 C.R.C. 502). It is clear, however, from the face of that order and decision of approval of the commission that it gave no consideration to the use of the Pacheco Pass route as a way of serving Fresno. Therefore the matter was not expressly decided. The case of *Re California Transit Co.*, 33 C.R.C. 574, is not in point. There the authorized transfer resulted in a duplication of service over the same highway. Here the route via Pacheco Pass to Fresno is over different arteries than that from Paso Robles to the valley route and Fresno. Reliance is placed upon *Tunzi-Valley and Coast Transit Company*, 45 C.R.C. 143. There approval of the commission was sought for a transfer from Tunzi to Valley and Coast Transit Company of an operative right between San Francisco and points in the Salinas Valley via the coast route. Valley and Coast then possessed a right to operate between San Francisco Bay area and Santa Barbara on the coast and extending into San Joaquin Valley. The record showed that if the transfers were authorized, Valley and Coast intended to mould it into their existing rights to the end that through service would be given between San Francisco to San Joaquin Valley points. It was claimed Valley and Coast would rely upon the 1941 amendment to section 50¾ of the Public Utilities Act, *supra*, to combine and achieve the above purpose unless the commission imposed restrictions. Valley and Coast contended no such restrictions could be imposed because of the 1941 amendment. The issues were stated to be "First—Does the 1941 amendment to Section 50¾ nullify restrictions existing in a highway common carrier operative right at the time the statute became effective, so that they may be disregarded should the holder undertake to consolidate that operative right with another subsequently acquired? And, Second— Has the Commission power to impose a restriction, in a transfer proceeding, limiting, in the public interest, the service that may be performed by the transferee under the operative right acquired? (45 C.R.C. 143, 148.) The commission after pointing out that it did not have before it the question of whether the 1941 amendment automatically permitted any and all combinations where various operative rights were acquired before its adoption, held that the amendment did not prevent the imposition of restrictions on combinations or

continuing the restrictions on acquired rights where the transfer of the operative rights was made after the adoption of the amendment, stating that: "If such a restriction [a restriction previously attached to the right sought to be transferred] should disappear, immediately upon the approval of the transfer of the operative right, or upon the acquisition by the grantee of another operative right, the Commission would then be powerless, in the public interest, to safeguard the equities of other carriers occupying the field, so as to insure the continuance of adequate service. Such a construction would strip the Commission of much of the authority it now possesses to protect both the public and the carriers against the evils of excessive competition." (45 C.R.C. 143, 148.) It is true that the commission went on to say that under the amendment the commission "must" determine in transfer proceedings whether public interest required that restrictions should be continued, yet it goes on to state that the commission "may impose an appropriate condition, designed to safeguard the operations of existing carriers." (45 C.R.C. 143, 150.) ▮ We do not interpret this to mean that the commission is foreclosed from later imposing restrictions in the public interest if it failed to do so in the transfer proceedings, especially where, as here, the issue was not raised in the transfer from Valley Coast and Transit Company to Motor Transport. (45 C.R.C. 502.) It may well be that all persons involved do not appear in the transfer proceedings or that the issues as framed although involving some restrictions do not involve others. To say that the commission is so limited is to deprive it of its flexibility and restrict its power to make salutary regulations in the protection of the public interest. This we are not disposed to do.

The order is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

EDMONDS, J.—I concur in the judgment. The amendment to section 50¾ of the Public Utilities Act, added in 1941 (Stats. 1941, p. 2061), in effect, authorizes a carrier, without the approval of the commission, to combine operative rights owned by it. But to serve Fresno via Pacheco Pass, the petitioners would not be making use of the certificate allowing the transportation of freight to that point insofar as the route is concerned.